IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FELICIA LESURE, *obo* L.L., | ) | CASE NO. 1:12-cv-10 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | REPORT & RECOMMENDATION |
| SECURITY | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule 72.2(b). The issue before the undersigned is whether the final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying Plaintiff Felicia Lesure's application for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, on behalf of her child, L.L., is supported by substantial evidence, and therefore, conclusive.

For the reasons set forth below, the Court recommends the decision of the Commissioner be VACATED.

## I. PROCEDURAL HISTORY

Plaintiff, Felicia Lesure ("Plaintiff" or "Lesure"), on behalf of her child, L.L., protectively applied for Supplemental Security Income benefits on December 16, 2008, alleging L.L. became disabled on this date. (Tr. 59, 117-19). Plaintiff alleges L.L. is disabled because she suffers from poor reading skills, behavioral problems and suicidal thoughts. (Tr. 174). The Social Security Administration denied Plaintiff's applications for benefits initially and upon reconsideration. (Tr. 59-60). Thereafter, Plaintiff requested a hearing before an administrative

law judge to contest the denial of her applications. (Tr. 71-73). The administration granted Lesure's request and scheduled a hearing. (Tr. 74-78).

On November 3, 2010, Administrative Law Judge Julia Terry (the "ALJ") convened a hearing via video to evaluate Plaintiff's applications. (Tr. 28-58). Plaintiff, L.L. and counsel appeared in Cleveland, Ohio, and the ALJ presided over the proceeding from St. Louis, Missouri. (Tr. 10). During the hearing, the ALJ heard testimony from Plaintiff and L.L. (Tr. 28-58). At the onset of the hearing, counsel notified the ALJ that there was additional medical evidence which Plaintiff wished to add to the record, but that such evidence was not yet ready to be submitted. (Tr. 31). Therefore, the ALJ agreed to hold the record open until November 18, 2010, in order for the records to be received by her office. (*Id*.). However, no such records were submitted to the ALJ within this timeframe. (Tr. 10).

On December 15, 2010, the ALJ issued her written decision denying Plaintiff's applications for benefits. (Tr. 10-22). Subsequently, Plaintiff sought review of this decision from the Appeals Council. (Tr. 115). Unfortunately for Plaintiff, the council also denied her request thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). Plaintiff now seeks judicial review of the ALJ's decision. Judicial review is proper pursuant to 42 U.S.C. § 405(g).

## II. PERSONAL & MEDICAL EVIDENCE[1]

### A. Personal & Educational

L.L. was born on January 26, 1993, and was 17 years old on the date of her hearing before the ALJ. (Tr. 34, 36, 59). L.L.'s problems in school date back to 2003. (Tr. 327). In

---

[1] The following recital is merely an overview of the personal and medical evidence pertinent to Plaintiff's appeal. It is not intended to reflect all of the medical evidence of record.

October of that year, an initial Individualized Education Program ("IEP") was designed specifically for L.L. (*Id*.). Plaintiff and L.L.'s teachers noted L.L. had difficulty with reading, writing and phonics. (*Id*.). Pursuant to the IEP, L.L. was permitted to take regular classes, with special education services provided as needed. (Tr. 330, 335). She was also afforded extended time to complete assignments and frequent breaks. (Tr. 332). IEPs were again arranged for L.L. in 2005, 2007, 2008 and 2009. (Tr. 342-53, 130-43, 162-72, 294-311).

Lynn Svoboda, a school services therapist, began treating L.L. in September 2008. (Tr. 590). After meeting with L.L. for over five months, Ms. Svoboda completed a questionnaire regarding L.L.'s behavior and mental health. (Tr. 590-93). The therapist indicated L.L. had difficulty regulating her moods and anger, and that she had been hospitalized due to these problems. (Tr. 590, 592). Although Ms. Svoboda acknowledged L.L. had some friends, she noted L.L. did not work well with others and became disrespectful to authority when she became angry. (*Id*.). Ms. Svoboda also stated L.L. could follow instructions and had no problems with maintaining concentration, or good hygiene. (Tr. 590-91). Finally, the therapist mentioned L.L.'s diagnosis of mood disorder (not otherwise specified) and possible bipolar disorder. (Tr. 593).

On May 5, 2009, Stephen Benjamin, an intervention specialist, completed a teacher questionnaire on behalf of the Bureau of Disability Determination. (Tr. 224-31). The questionnaire asked Mr. Benjamin to rate L.L.'s abilities in all six categories of functioning applicable in child disability cases.[2] (*Id*.). With regard to the domain of acquiring and using information, Mr. Benjamin indicated L.L. exhibited at least "an obvious problem" in all ten areas evaluated in this category. (Tr. 225). He noted L.L. also had difficulty in the domain of

---

[2] *See* Section III, *infra*.

3

attending and completing tasks, opining L.L. exhibited "serious problems" in 6 of the 13 functions considered in this category. (Tr. 226). Mr. Benjamin found L.L. only suffered from a "slight problem" in sustaining attention while playing sports, but had an "obvious" or "very serious" problem in the remaining 6 functions in this category. (*Id.*). Mr. Benjamin commented L.L. allowed her personal issues to interfere with in-class assignments. (*Id.*). Next, he assessed L.L.'s abilities in the area of interacting and relating with others. (Tr. 227-28). Again, he observed L.L. exhibited problems in this area. Aside from finding L.L. to only suffer a "slight problem" in interpreting facial expressions and body language, Mr. Benjamin ruled L.L. had at least an "obvious problem" in the remaining 12 areas assessed under this domain. (*Id.*). He mentioned L.L. had to be removed from the classroom due to her disruptive behavior. (Tr. 227). Mr. Benjamin also examined L.L.'s ability to care for herself. (Tr. 229). He indicated L.L. had only a "slight" or no problem in half of the tasks evaluated in this category and at least an "obvious" problem the remaining half. (*Id.*). However, Mr. Benjamin did not find L.L. to demonstrate any problems in the domain of moving about and manipulating objects. (Tr. 228). Finally, he commented that he was unaware of whether L.L.'s functioning changed based on medication because he believed L.L. took her medication in the evening and on an inconsistent basis. (Tr. 230).

  Plaintiff testified L.L. did not attend school on a consistent basis. (Tr. 49). Instead, L.L. would attend classes for a couple of days then refuse to go to school. (*Id.*; Tr. 626). At the time of the hearing, L.L. was not enrolled in school. (Tr. 34, 40). L.L. eventually enrolled in a program called Life Skills to earn her diploma, but her time there was short-lived. (Tr. 34, 291-93). She then attempted to attain her GED while taking classes at Berea Children's Family Services, but that was also unsuccessful as she only attended class for one day. (*Id.*; Tr. 40).

4

B.  Medical

In December 2008, when L.L. was 15 years old, she was admitted to Windsor-Laurelwood Center for Behavior Medicine ("Windsor"), due to experiencing suicidal thoughts. (Tr. 530, 559).  She displayed significant depressive symptomatology, and her Global Assessment of Functioning ("GAF") score was assessed at 25.  (Tr. 559).  During her stay, L.L. participated in group and milieu treatment and was given prescription medication to help manage her symptoms.  (Tr. 559-60).  L.L. was discharged four days later with instructions to follow up with Dr. Elizabeth Hill at Berea Children's Home and Family Services.  (Tr. 560).  At the time of discharge, L.L.'s prognosis was fair and her GAF score was 45-50.  (Tr. 559-60).

L.L. first presented to Dr. Hill on January 16, 2009.  (Tr. 599-602).  The doctor noted L.L. presented with problems of anger and sadness.  (Tr. 599).  L.L. also admitted that at times she had thoughts about violent acts such as killing her brother and others.  (*Id*.).  Dr. Hill found L.L. had problems with behavior in school which led to L.L. being suspended for five days.  (Tr. 600).  L.L. was diagnosed with mood disorder (not otherwise specified) and possible bipolar disorder and prescribed Abilify to help treat her symptoms.  (Tr. 602).  Dr. Hill continued to treat L.L. and was doing so as of the date of L.L.'s hearing before the ALJ.

On February 14, 2009, Dr. Kevin Goeke, a state agency reviewer, assessed L.L.'s functioning based on a review of L.L.'s medical file.  (Tr. 546-51).  Dr. Goeke noted L.L. suffered from major depression and a learning disorder, but did not meet or equal the listings. (Tr. 546).  In the domains of acquiring and using information and attending and completing tasks, Dr. Goeke opined L.L. had a "less than marked" limitation.  (Tr. 548).  He commented L.L. received additional intensive instruction in school and had problems following directions and making good use of her time.  (*Id*.).  Dr. Goeke found L.L. suffered from a "marked"

impairment in the domain of interacting and relating to others. (*Id*.). Dr. Goeke noted L.L. was suspended from school due to fighting and stealing, used abusive language with staff and exhibited disruptive behavior. (*Id*.). However, he found L.L. had no limitation in the remaining three domains of moving about and manipulating objects, caring for herself or health and physical well-being. (Tr. 549). On June 12, 2009, state agency reviewer, David Demuth, re-evaluated L.L.'s medical file and affirmed Dr. Goeke's findings as written. (Tr. 552-57).

On November 11, 2009, L.L. was admitted to Windsor again. (Tr. 618-25). Police officers took L.L. to the facility after she had an altercation with her siblings, putting herself and her family in danger. (Tr. 620). At the time of admission, L.L.'s GAF score was 20; she was defiant and moody during the initial portion of her stay. (Tr. 618). She admitted to the medical staff that she "cheeked" her medication, Abilify, about twice a month. (Tr. 620). L.L. also tried to cheek her medication while at the center. However, L.L. eventually complied with treatment during the latter part of her stay. (Tr. 618). When she was discharged on November 17, 2009, Dr. Michael Ray assessed L.L.'s GAF score at 60 and noted she was released in a stable improved condition. (Tr. 618-19).

On October 6, 2010, L.L.'s therapist, Michelle Sims, completed a functional questionnaire evaluating L.L.'s abilities in the six relevant domains. (Tr. 414-23). Ms. Sims indicated L.L. had mostly moderate difficulties in the areas of acquiring and using information and caring for herself. (Tr. 415, 420). But, in the domain of interacting and relating with others, Ms. Sims opined L.L. generally exhibited moderate to marked difficulties. (Tr. 417). Ms. Sims mentioned L.L. did not handle authority well and had severe anger outbursts. (*Id*.). On the other hand, Ms. Sims concluded that for the most part, L.L. rarely had difficulties in the domains

of attending and completing tasks, moving and manipulating objects and caring for her health and well-being. (Tr. 418, 422-23).

On October 28, 2010, another of L.L.'s therapist, Ms. Lynn Franks, completed the same questionnaire. (Tr. 407-13). In Ms. Franks' opinion, L.L. displayed no more than moderate difficulties in the domain of acquiring and using information. (Tr. 408). Although Ms. Franks opined L.L. exhibited marked difficulties in 3 of the 11 functions evaluated under the domain of interacting and relating with others, Ms. Franks indicated L.L. had no more than moderate difficulties in the remaining 8 functions examined in this domain. (Tr. 409). Ms. Sims indicated she did not have sufficient knowledge to evaluate L.L. in each of the areas assessed in the domains of attending and completing tasks and caring for herself, but, in those areas Ms. Sims could evaluate, she concluded L.L.'s difficulties were mostly moderate. (Tr. 410-11). Likewise, Ms. Sims could only evaluate L.L. in 2 of the 7 areas reviewed in the domain of moving about and manipulating objects. (Tr. 412). In those two areas, Ms. Sims opined L.L. demonstrated no difficulty with gross motor skills and moderate difficulty with fine motor skills. (*Id.*). Ms. Sims was unable to evaluate L.L. in any of the functions tested in the domain of caring for health and well-being. (Tr. 413).

Lastly, on October 31, 2010, Dr. Hill rated L.L.'s functional abilities. (Tr. 673-79). Dr. Hill did not express any opinion about L.L.'s abilities in the domain of acquiring and using information. (Tr. 674). But, Dr. Hill opined L.L. generally suffered from marked difficulties in the areas of interacting and relating with others and attending and completing tasks. (Tr. 675-76). Dr. Hill commented L.L. had "problems with relationships and complying with rules" and that while L.L.'s problems improved with treatment, they were not resolved. (*Id.*). In the domain of caring for herself, Dr. Hill indicated L.L.'s difficulties ranged from moderate to extreme. (Tr.

7

677). The doctor noted L.L. had a difficult time dealing with stress, frustration and changes in her environment. (*Id.*). With regard to moving about and manipulating objects, Dr. Hill found L.L. generally had moderate problems which were associated with her obesity. (Tr. 678). Finally, Dr. Hill opined L.L. rarely experienced difficulty in the domain of caring for health and well-being. (Tr. 679). However, the doctor noted L.L.'s medication affected her functioning and that she easily became tired and/or required naps. (*Id.*). Dr. Hill also commented, "[m]edication improves child's functioning[;] [f]unctioning regresses off medication". (*Id.*).

### III. STANDARD FOR CHILDHOOD SSI CASES

A child under age eighteen will be considered disabled if he/she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(i). Childhood disability claims involve a three-step process evaluating whether the child claimant is disabled. 20 C.F.R. § 416.924. First, the ALJ must determine whether the child claimant is working. If not, at step two the ALJ must decide whether the child claimant has a severe mental or physical impairment  Third, the ALJ must consider whether the claimant's impairment(s) meet or equal a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1. An impairment can equal the listings medically or functionally. 20 C.F.R. § 416.924.

A child claimant medically equals a listing when the child's impairment is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). Yet, in order to medically equal a listing, the child's impairment(s) must meet all of the specified medical criteria. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-32 (1990).

A child claimant will also be deemed disabled when he or she functionally equals the listings.  The regulations provide six domains that an ALJ must consider when determining whether a child functionally equals the listings.  These domains include:

(1) Acquiring and using information;

(2) Attending and completing tasks;

(3) Interacting and relating with others;

(4) Moving about and manipulating objects;

(5) Caring for yourself; and,

(6) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1).  In order to establish functional equivalency to the listings, the claimant must exhibit an extreme limitation in at least one domain, or a marked impairment in two domains.  20 C.F.R. § 416.926a(d).

> The regulations define "marked" and "extreme" impairments:
>
> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities...[it] also means a limitation that is "more than moderate" but "less than extreme."  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i).

> We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities...[it] also means a limitation that is "more than marked."  "Extreme" limitation is the rating we give to the worst limitations.  However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function.  It is the equivalent of the functioning we would expect to find on standardized testing scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i).

During the evaluation of a child disability claim, the ALJ must consider the medical opinion evidence in the record. 20 C.F.R. § 416.927. A treating physician's opinions should be given controlling weight when they are well-supported by objective evidence and are not inconsistent with other evidence in the record. 20 C.F.R. § 416.927(c)(2). When the treating physician's opinions are not given controlling weight, the ALJ must articulate good reasons for the weight actually assigned to such opinions. *Id.* The ALJ must also account for the opinions of the non-examining sources, such as state agency medical consultants, and other medical opinions in the record. 20 C.F.R. § 416.927(e)(2)(i-ii). Additionally, the regulations require the ALJ to consider certain other evidence in the record, such as information from the child's teachers, 20 C.F.R. § 416.926a(a), and how well the child performs daily activities in comparison to other children the same age. 20 C.F.R. § 416.926a(b)(3)(i-ii).

## IV. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence and whether, in making that decision, the Commissioner employed the proper legal standards. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "Substantial evidence" has been defined by the Sixth Circuit as more than a scintilla of evidence, but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if a reasonable mind could accept the record evidence as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* While the Court has discretion to consider the entire record, this Court does not determine whether issues of fact in dispute would be decided differently, or if substantial evidence also supports the opposite conclusion. The Commissioner's decision, if supported by substantial

10

evidence, must stand. *See Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner,* 745 F.2d at 387. However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.,* 884 F.2d 241, 245 (6th Cir. 1989).

## V. ANALYSIS

Plaintiff asserts three assignments of error challenging the ALJ's decision. First Plaintiff contends the ALJ erred by failing to consider the medical opinions issued by persons deemed "other sources" as required by Social Security Ruling 06-3p. Next, Plaintiff argues substantial evidence does not support the ALJ's finding that L.L. did not have a learning disorder. Plaintiff's final objection claims the ALJ improperly evaluated the opinions of L.L.'s treating psychiatrist. This final assignment of error states a valid basis for remand.

It is well-recognized that an ALJ must give special attention to the findings of a claimant's treating sources. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). This doctrine, referred to as the "treating source rule" is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treatment relationship with an individual are best equipped to provide a complete picture of the individual's health and medical history. *Id.*; 20 C.F.R. § 404.1527(c)(2).[3] The treating source doctrine indicates that

---

[3]Effective March 26, 2012, sections 404.1527 and 416.927 of the Code of Federal Regulations were amended. Paragraph (d) of each section was redesignated as paragraph (c). *See* 77 F.R. 10651-01, 2011 WL 7404303.

11

opinions from such physicians are entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson*, 378 F.3d at 544.

Even when a treating source's opinion is not entitled to controlling weight, the ALJ must still determine how much weight to give to the opinion by applying specific factors set forth in the governing regulations. 20 C.F.R. § 404.1527(c)(1)-(6). The regulations also require the ALJ to provide "good reasons" for the weight ultimately assigned to the treating source's opinion. 20 C.F.R. § 404.1527(c)(2). An ALJ's failure to adhere to this doctrine generally necessitates remand. *Wilson*, 378 F.3d at 545. The Sixth Circuit has admonished that "[w]e will reverse and remand a denial of benefits, even though 'substantial evidence otherwise supports the decision of the Commissioner,' when the ALJ fails to give good reasons for discounting the opinion of the claimant's treating physician." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (*quoting Wilson*, 378 F.3d at 543-46).

In the instant case, the ALJ indicated she gave little weight to opinions of L.L.'s treating psychiatrist, Dr. Elizabeth Hill, because the doctor's opinions were not fully consistent with her treatment notes or other evidence in the record. *Wilson* recognized inconsistencies as a sufficient basis to decline assigning controlling weight to a treating source's opinion, however, the regulations also require the ALJ to provide good reasons for the weight ultimately assigned to the source's opinion. *Wilson*, 378 F.3d at 544; 20 C.F.R. § 416.927(c). Although the ALJ adequately explained why Dr. Hill's opinion was not entitled to controlling weight, the undersigned finds the ALJ did not supply *good* reasons for giving Dr. Hill's opinion little weight.

Specifically, the undersigned notes that the ALJ's reasoning is not supported by the record. The ALJ criticized Dr. Hill for failing to consider L.L.'s overall lack of compliance with

12

treatment.  However, a review of Dr. Hill's report shows the doctor was well aware of L.L.'s problems with medication compliance.  The questionnaire Dr. Hill completed asked her to rate L.L.'s abilities in a series of tasks for each of the six domains at issue in child disability cases.  The questionnaire also allowed the doctor to comment upon L.L.'s functioning in each domain.  In commenting on L.L.'s abilities in the domain of caring for health and well-being, Dr. Hill explicitly addressed L.L.'s non-compliance stating, "[m]edication improves child's functioning[;] [f]unctioning regresses off medication".  (Tr. 679).  Thus, Dr. Hill was clearly aware that L.L.'s functioning, at least in this domain, was directly impacted by medication.

The ALJ accused Dr. Hill of ignoring this factor during her evaluation of L.L.'s abilities in the domain of interacting and relating with others.  But, the fact that Dr. Hill acknowledged L.L.'s problem with medication compliance later in her report indicates she was cognizant of this issue when rendering her opinions throughout the report.  The ALJ's statement to the contrary was purely speculative.  The ALJ assumed Dr. Hill's marked findings in this domain failed to account for L.L.'s non-compliance, but neither the ALJ nor the Commissioner identified any evidence suggesting Dr. Hill's assessment of L.L.'s abilities in this domain were made without consideration of this factor.[4]

Furthermore, the ALJ did not provide *good* reasons for rejecting Dr. Hill's assessment of L.L.'s difficulties in the domain of attending and completing tasks.  Apparently, the ALJ rejected the doctor's conclusion that L.L. suffered from marked to extreme limitations in this domain because the ALJ believed it was somehow inconsistent with Dr. Hill's comment that "[L.L.'s] problems with inattention improve[d] with treatment."  (Tr. 15).  But, there are two crucial flaws

---

[4]Because the ALJ ultimately concluded L.L. had a marked impairment in this domain, this error was harmless.

within the ALJ's analysis of Dr. Hill's statement. First, the ALJ took Dr. Hill's statement out of context. Dr. Hill's full comment stated that L.L.'s problems with inattention improved with treatment, "but [were] not resolved". (Tr. 676). This statement suggests that medication had yet to remedy L.L.'s impairment in this domain.

Second, the ALJ seemed to contrast Dr. Hill's comment with the doctor's findings illustrated in the chart Dr. Hill completed assessing L.L.'s difficulties in this domain. The chart showed L.L. suffered marked difficulties in 9 of the 13 tasks examined, and extreme difficulties in 2 of the remaining 4 tasks. Although the ALJ believed Dr. Hill's comment that L.L. "improved with treatment" was inconsistent with Dr. Hill's marked and extreme findings, the two do not necessarily conflict. It was equally reasonable to interpret Dr. Hill's findings of marked and extreme limitations as accurately reflecting the severity of L.L.'s problems even when she was compliant with medication, because as Dr. Hill mentioned, treatment improved, but did not resolve, L.L.'s difficulties in this domain. The ambiguity created between Dr. Hill's chart findings and accompanying commentary heightened the importance of the ALJ's explanation of her reasons for discrediting Dr. Hill.[5] Although the ALJ pointed to school records

---

[5] Plaintiff contends the ALJ should have recontacted Dr. Hill pursuant to 20 C.F.R. § 416.912(e)(1) to resolve this ambiguity, but it is not clear whether the ALJ had an affirmative duty to do so under the statute. Prior to March 26, 2012, this regulation directed adjudicators to contact a claimant's treating source in order to resolve ambiguities and/or conflicts in the source's medical report. *See* 20 C.F.R. § 404.1512(e)(1) ("We will first recontact your treating physician or psychologist . . . . when the report from your medical source contains a conflict or ambiguity that must be resolved. . . .") (effective June 13, 2011 to March 25, 2012). However, this requirement was removed from the regulation when it was amended in March 2012. *See* 77 FR 10651-01. Neither party presented arguments to the Court addressing which version of the regulation applied to this case given that the ALJ's opinion was issued in December 2010, prior to the amendment. However, the undersigned is inclined to find that the prior version of the ruling would apply and therefore have required the ALJ to contact Dr. Hill.

showing L.L. could participate in class and complete assignments despite problems with becoming distracted, given the ALJ's mischaracterization of Dr. Hill's statement, the undersigned finds that L.L.'s school records alone do not constitute good reasons for discrediting Dr. Hill's finding. Consequently, the undersigned finds the ALJ's reasons for discrediting Dr. Hill's assessment of L.L.'s difficulties in this area are not sufficient to satisfy the good reasons requirement.

The ALJ's failure to provide good reasons for rejecting Dr. Hill's findings is detrimental because had the ALJ credited Dr. Hill's evaluation of L.L.'s impairment in this domain, the regulations would have directed the ALJ to find L.L. disabled. Pursuant to 20 C.F.R. § 416.926a(d), a child claimant is deemed to functionally equal the listings when the child has marked impairments in two domains or an extreme impairment in one domain. 20 C.F.R. § 416.926a(d). Although the ALJ questioned Dr. Hill's finding that L.L. had marked difficulties in interacting and relating with others, the ALJ ultimately adopted this finding. Had the ALJ also credited Dr. Hill's marked findings regarding L.L.'s difficulties in attending and completing tasks, she would have been compelled to find L.L. disabled. Therefore, the ALJ's evaluation of Dr. Hill's opinion on this issue was dispositive of the ALJ's ultimate ruling, and the ALJ's failure to provide good reasons for discounting the opinion necessitates remand.

Because the undersigned finds remand is warranted due to the ALJ's failure to adhere to the treating source rule, it is not necessary to address Plaintiff's remaining objections to the

---

Plaintiff also alleged the ALJ had a duty to recontact Dr. Hill pursuant to Social Security Ruling 96-5p. But, this ruling applies exclusively to situations where the claimant's treating source opines on an issue reserved to the Commissioner. SSR 96-5p, at *1-2. It does not apply where the source comments regarding the nature and severity of the claimant's impairments, as Dr. Hill did here. *Id.*

ALJ's decision at length. Plaintiff argues the ALJ failed to mention or evaluate, the opinions offered by L.L.'s therapists, Ms. Sims and Ms. Franks, and L.L.'s intervention specialist at school, Mr. Benjamin. Plaintiff also asserts the ALJ discounted the opinions of L.L.'s therapist, Ms. Svoboda, for improper reasons. The governing regulations define an "acceptable medical source" as a licensed physician, psychologist, optometrist, podiatrist or qualified speech-language pathologist. 20 C.F.R. § 416.913(a). On the other hand, therapists, educational personnel and other non-medical sources are defined as "other sources". 20 C.F.R. § 416.913(d). Accordingly, Ms. Sims, Ms. Franks, Mr. Benjamin and Ms. Svoboda all constitute as "other sources" under the regulations.

Social Security Ruling 06-3p admonishes ALJs to explain the weight given to "other sources", or otherwise ensure that the claimant or subsequent reviewer can "follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 71 FR 45593-03, at *45596. According to this ruling, the ALJ should have explained how she viewed the opinions of Ms. Sims, Ms. Franks and Mr. Benjamin. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (finding under SSR 06-03p, the ALJ "should have discussed the factors relating to his treatment of [the claimant's nurse practitioner's] assessment, so as to have provided some basis for why he was rejecting the opinion" even though she constituted as an "other source"). In addition, although the ALJ briefly discussed Ms. Svoboda's findings, the ALJ only assigned partial weight to her opinion, noting she had last seen the claimant on March 12, 2009. (Tr. 15). Yet, the ALJ assigned great weight to the opinion of state agency reviewer, Mr. Goeke, who never personally treated L.L. and issued his opinion in February 2009. On remand, the ALJ should address this discrepancy.

Finally, Plaintiff submits the ALJ erred by failing to explicitly recognize L.L.'s learning disorder as one of her impairments.  Both state agency reviewers acknowledged L.L.'s diagnosis of a learning disorder.  Though the undersigned is not convinced the ALJ's failure to mention this impairment constituted reversible error, because the case is being remanded on other grounds, it will place no greater burden on the ALJ to reconsider the impact of this impairment on Plaintiff's disability application.

## VI. **DECISION**

For the foregoing reasons, the Magistrate Judge finds the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the Court recommends the decision of the Commissioner be VACATED and REMANDED to the Social Security Administration for further proceedings not inconsistent with this Report and Recommendation.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: November 29, 2012.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn,* 474 U.S. 140 (1985); *see also United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).